UNITED STATES of America, Plaintiff.

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**GENERAL MOTORS CORPORATION, Plaintiff,**

v.

**William T. COLEMAN et al., Defendants.**

**Civ. Nos. 75–0049 and 75–0047.**

United States District Court, District of Columbia.

July 23, 1976.

---

John M. Kelson, Atty., Dept. of Justice, Washington, D. C., who was joined on the brief by: David J. Anderson, Dept. of Justice, Robert M. Werdig, Jr., Robert N. Ford, Asst. U. S. Attys., Earl J. Silbert, U. S. Atty., and Rex E. Lee, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

James Robertson, joined by Walter T. Winslow, Jr. and Mary McReynolds, Wilmer, Cutler & Pickering, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JUNE L. GREEN, District Judge.

The central action of these consolidated proceedings is an enforcement proceeding by the United States seeking declaratory and injunctive relief under the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), as amended, 15 U.S.C. § 1381 *et seq.* Civil penalties are also sought.

On December 19, 1974, the Administrator of the National Highway Traffic Safety Administration (NHTSA) determined that a defect relating to motor vehicle safety exists with respect to the fuel inlet plug of the Rochester Quadrajet carburetor ("Quadrajet"). The defect concerns dislodgement of the Quadrajet fuel inlet plug which allows raw gas to be discharged into the engine compartment, thus resulting in a possibility of an engine compartment fire. As a consequence of the determination, General Motors Corporation (General Motors or "GM") was directed, pursuant to section 113(e) of the Act, to notify owners of 1965 and 1966 Chevrolets and 1966 Buicks of the defect.

General Motors has refused to issue such notice and has sought judicial review of the Administrator's determination, which complaint was consolidated with the action filed by the government seeking enforcement of NHTSA's proceedings.

On July 14, 1976, this matter came before the Court on the Motion for Summary Judgment of the United States. General Motors opposed the motion stating that an issue of material fact exists on the question of whether the alleged defect posed an "unreasonable risk of accident, injury and death." In support of its position, General Motors asserted that the incidence of future plug failure would be negligible, and that based on statistical prediction there will be less than one injury and no deaths as a result of the defect.

Upon consideration of the pleadings, exhibits and briefs filed by the parties and having heard the argument of counsel, the Court, as set forth below, finds the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Introduction

(1) General Motors, defendant herein, a Delaware corporation which maintains its principal office and place of business in Detroit, Michigan, is, and at all times relevant to this action has been, engaged in the transaction of business in, and under the laws of, the District of Columbia, all within the jurisdiction of this Court.

(2) General Motors is, and at all times relevant to this action has been, a manufacturer engaged in interstate commerce within the meaning of Section 102 of the Safety Act, 15 U.S.C. § 1391, and subject to the provisions of the Safety Act, 15 U.S.C. §§ 1381 *et seq.*

(3) The Secretary of Transportation has delegated the authority to carry out the Act to the National Highway Traffic Safety Administrator.

(4) The Administrator has delegated to the Associate Administrator for Motor Vehicle Programs the authority to make initial determinations of the existence of defects related to motor vehicle safety in classes of motor vehicles or motor vehicle equipment.

(5) During the period which encompassed model years 1965 and 1966 General Motors manufactured for sale, sold, offered for sale, introduced and delivered for introduction in interstate commerce approximately three hundred seventy four thousand, five hundred eighteen (374,518) Chevrolet and Buick vehicles manufactured prior to March 28, 1966 and equipped with the Rochester Quadrajet carburetor.

(6) As of January 1, 1976, General Motors estimates that approximately one hundred eighty six thousand (186,000) 1965 and 1966 model year Chevrolets and 1966 model year Buicks, originally equipped with the Quadrajet, remain in use on American Highways.

(7) As of January 1975, General Motors estimates that the vehicles in question have amassed more than 23 billion miles in the aggregate, or 83 per cent of their service life.

(8) As a result of testing, inspection, investigation, research and reports, all relating to the safety of the design, manufacturing and performance of the fuel inlet plug of the Rochester Quadrajet carburetor installed on 1965 and 1966 model General Motors vehicles, the Associate Administrator for Motor Vehicle Programs, by letter dated May 20, 1974, informed defendant that it had been initially determined that a defect which relates to motor vehicle safety exists with respect to the Quadrajet installed on 1965 and 1966 model year Chevrolets and 1966 model year Buicks manufactured prior to March 28, 1966.

(9) On May 20, 1974 the Associate Administrator for Motor Vehicle Programs also provided General Motors a copy of the Office of Defects Investigation Report dated May 1974.

(10) On July 9, 1974 the Administrator afforded General Motors opportunity to present its views and evidence in support thereof, to establish that the alleged defect does not affect motor vehicle safety.

(11) By letter dated December 19, 1974, the Administrator determined that a defect which relates to motor vehicle safety exists with respect to the fuel inlet plug of the Rochester Quadrajet carburetor, manufactured prior to March 28, 1966 and installed on 1965 and 1966 model year Chevrolets and 1966 model year Buicks and directed the defendant to furnish the notification specified in Section 113(c) of the Safety Act, 15 U.S.C. § 1402(c), to the purchasers of such vehicles as provided in Section 113(a) and(b) thereof, 15 U.S.C. § 1402(a) and (b), all pursuant to Section 113(e)(2) of the Safety Act, 15 U.S.C. § 1402(e)(2).

(12) Since December 19, 1974, General Motors has failed to issue the defect notification required by the December 19, 1974 letter from the Administrator.

*Defect*

(13) The areas of the Quadrajet carburetor which are involved include (1) an access hole necessary for manufacturing purposes, approximately one-half inch in diameter, which is the end of a fuel channel in a cast zinc alloy carburetor fuel bowl, and (2) an aluminum plug assembled with a press fit to close that hole.

(14) The channel of the Quadrajet carburetor is part of the fuel passage from the fuel pump to the carburetor bowl, thus the "inside" of the plug is subjected to fuel pump pressures.

(15) If the plug of the Quadrajet carburetor becomes dislodged, fuel supply to the carburetor bowl is stopped. When the fuel contained in the carburetor bowl is consumed by the engine, it will stop running. While the engine is operating on the fuel contained in the bowl, the fuel pump discharges fuel from the open hole. There is a possibility that this fuel may be ignited by some part of the ignition system, resulting in an underhood fire before the engine stops running.

(16) At least 665 underhood fires have, in fact, occurred in 1965 and 1966 Chevrolets and 1966 Buicks equipped with the Rochester Quadrajet carburetor.

(17) At least seventy (70) to three hundred (300) engine compartment fires have, in fact, resulted from failure of the fuel inlet plug of the Rochester Quadrajet carburetor, as installed on 1965 and 1966 model year Chevrolets and 1966 model year Buicks.

(18) The fuel inlet plug of the Rochester Quadrajet carburetor, manufactured before March 28, 1966, as installed on 1965 and 1966 model year Chevrolets and 1966 model year Buicks, has, in fact, failed by becoming dislodged so as to permit the spillage or leakage of gasoline.

(19) General Motors has admitted that a significant number of such failures, as described in paragraph 18, have, in fact, occurred.

(20) General Motors on several occasions initiated production changes to secure the

Quadrajet's fuel inlet plug. On October 19, 1965, the Oldsmobile Division incorporated a production four-point staking operation to secure the fuel inlet plug in place. A final production revision was incorporated for all Quadrajet carburetors on March 28, 1966. This design change involved a spinning operation and rolled zinc casting of the carburetor body over the edge of the fuel inlet plug.

### Motor Vehicle Safety (Owners)[1]

(21) Serena Mangus owns a 1966 Buick Riviera. On June 19, 1974 the vehicle's engine compartment caught fire. Pulling over to the side of the street, the car burst into flames. At first, Mrs. Mangus could not get out of the car. She tried to undo the seat belt, but could not. She also failed to get out the passenger side of the car. In this attempt, Mrs. Mangus hit her wrist and arm. Finally, jumping from the car, she hit her head. Afterwards, she reported experiencing blurred vision in the left eye. Mrs. Mangus' Buick was damaged in excess of $1,100.

(22) Mary Denham formerly owned a 1966 Buick Riviera. During the summer of 1974 the engine compartment caught fire. She jumped out of the car as fast as she could. The fire lasted 10 or 15 minutes. The Buick Riviera was totalled.

(23) James Feick, owner of a 1966 Buick Riviera, experienced an underhood fire in April of 1973. Stopping the car, Mr. Feick proceeded to use a fire extinguisher to put out the flames. Mr. Feick singed his eyebrows and hair in attempting to extinguish this fire.

(24) Catherine Roat was a passenger in a 1966 Chevrolet Caprice during an engine compartment fire which occurred in April of 1972. Her husband pulled the car over to the side of an expressway overpass. The passenger's door could not be opened since it was up against a freeway bridge railing. After the occupants got out of the car through the driver's door, they stood along the freeway bridge trying to keep out of traffic.

(25) Sharon Barr, driving a 1966 Buick Riviera, experienced an underhood fire during July of 1973. Mrs. Barr ran from the car. The Fire Department arrived and put out the fire. Damage to the Buick Riviera included a shattered front window, burned front tires and wiring. The vehicle was totalled.

(26) Wanda Sharp experienced an engine compartment fire in a 1966 Chevrolet Impala during December of 1973. The vehicle was extensively damaged.

(27) Sally Flippen, as a passenger in a 1966 Chevrolet Caprice, experienced an underhood fire in November of 1971. The car, both interior and engine compartment, burned almost immediately. The vehicle was totalled. All the seats were charred, the whole inside of the roof was charred.

### Motor Vehicle Safety (Studies)

(28) In California alone, approximately 100 people per year are killed as a result of vehicle disablement whether they remain in the vehicle or walk to get assistance. Vehicle disablement Study, April 1974, prepared for NHTSA, U. S. Department of Transportation.

(29) On the Interstate System approximately 3.5 per cent of all vehicle collisions involve parked cars on the shoulder of the highway. "Fatal Accidents on Completed Sections of the Interstate Highway System, 1968." Public Roads, Vol. 35, No. 10, October, 1969.

### CONCLUSIONS OF LAW

Based on the foregoing, the Court determines as its Conclusions of Law the matters set forth below:

■ (1) The Safety Act defines a "defect" as "any defect in performance, con-

---

1. The following information was taken from depositions taken in the instant action.

struction, components, or materials in motor vehicles or motor vehicle equipment." 15 U.S.C. § 1391(11). The Government makes out a *prima facie* case of "defect" by showing a significant number of failures in past performance.

Where, as here, the component is designed to function without replacement over the lifetime of the vehicle, the Government may discharge its burden of showing a significant number of failures without any showing of cause.

*United States v. General Motors Corp.*, ("Wheels"), 171 U.S.App.D.C. 27, 518 F.2d 420, 427 (1975).

■ (2) The Rochester Quadrajet carburetor, manufactured prior to March 28, 1966 and installed on 1965 and 1966 model year Chevrolets and 1966 model year Buicks, constitutes a "defect," as revealed by a significant number of failures of the carburetor's fuel inlet plug in past performance. *See United States v. General Motors Corp.* ("Wheels"), *supra,* at 438, n. 84 (1975); *United States v. General Motors Corp.* ("Pitman Arm"), 65 F.R.D. 115, 117–118 (D.D.C.1974).

(3) As a matter of law, the Rochester Quadrajet carburetor, therefore, "is subject to a significant number of failures in normal operation." *United States v. General Motors Corp.* ("Wheels"), *supra,* at 427.

(4) Since General Motors "does not intend to further litigate the 'defect' issue in response to the Government's Motion or during future stages of this case" (Defendant's Brief, p. 3),[2] and the undisputed facts establish that the Rochester Quadrajet carburetor constitutes a "defect," no material issue of fact exists as to the number of fuel inlet plug failures and engine compartment fires which may occur in the future.

(5) "Motor vehicle safety," as defined by the Safety Act, means:

[T]he performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles. 15 U.S.C. § 1391(1).

■ (6) It is not necessary that a collision or death has occurred or will occur as a result of the defect. The purpose of the Act is to provide owners with an adequate margin of safety to protect against vehicle failures, which are in and of themselves an accident under the Act, and which result in an unreasonable risk of personal or property damage. *See* 15 U.S.C. § 1401(a)(3)(B), as amended, S.Rep.No.1301, 89th Cong.; 2d Sess. 5 (1966) at 3, U.S.Code Cong. & Admin.News 1966, p. 2709, *United States v. General Motors Corp.* ("Wheels"), *supra,* at 435.

■ (7) Failure of the Quadrajet's fuel inlet plug, which permits raw gasoline to be openly discharged in the engine compartment with the attendant possibility of underhood fire, presents "a clear danger of accidents and injuries." *United States v. General Motors Corp.* ("Wheels"), *supra,* at 442, n. 112. It is *per se* related to "motor vehicle safety."

■ (8) Even if this "defect" were not *per se* related to "motor vehicle safety," the uncontested facts of this case establish that fuel inlet plug failure results in several obvious and undeniable safety hazards. *First,* once the plug fails, the car "will stop running." The driver must then either abandon his vehicle in the midst of oncoming traffic or, if he can, pull over to the side

---

**2.** At hearing General Motors counsel stated: "[W]e have in effect stipulated or admitted the defect question out of the case." Transcript of Proceedings (July 14, 1976), p. 25.

of the road. Both situations are dangerous. *Second*, an underhood fire may spread to the passenger compartment and threaten driver and passenger alike. *Third,* the occupants of the vehicle may be injured endeavoring to get out of the car when such an underhood fire occurs. *Fourth,* attempts to put out an engine compartment fire may result in further injury.

(9) It is, therefore, plain that the Rochester Quadrajet carburetor is a safety defect because the public, by the fact of this defect's existence, is not protected "against unreasonable risk of accidents [or] * * * death or injury" in the event of such accidents. 15 U.S.C. § 1391(1). *Cf. Larsen v. General Motors Corporation,* 391 F.2d 495, 505–506 (8th Cir. 1968).

■ (10) While proof of *actual* harm is neither sought nor demanded by the Safety Act, the uncontested facts of this case establish that failure of the Quadrajet's fuel inlet plug has resulted in clear safety hazards and injury. Therefore, no material issue of fact exists as to the *number* of accidents and injuries which may occur in the future. It suffices that the "defect" exists at present and its occurrence poses an unreasonable risk of accident, death, or injury.

· [7] (11) In these circumstances, considering "the size of the business," "the gravity of the . violation" (15 U.S.C. § 1398(b)), and the lack of mitigating circumstances, a civil penalty of $400,000, in consequence of General Motors' having failed to provide notification and "fair warning" of this safety defect is both warranted and appropriate.