UNITED STATES of America

v.

GENERAL MOTORS CORPORATION, Appellant.

GENERAL MOTORS CORPORATION, Appellant,

v.

Brock ADAMS, Secretary of Transportation, et al.

Nos. 76–1744 and 76–1745.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1977.

Decided Oct. 14, 1977.

James Robertson, Washington, D. C., with whom John H. Pickering and A. Stephen Hut, Jr., Washington, D. C., were on the brief, for appellant.

Neil H. Koslowe, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Acting Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before WRIGHT, ROBINSON, and MacKINNON, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge.

On December 19, 1974 the Administrator of the National Highway Traffic Safety Administration (NHTSA), acting pursuant to his authority under the National Traffic and Motor Vehicle Safety Act, determined that Rochester Quadrajet carburetors installed in 1965 Chevrolets and 1966 Chevrolets and Buicks contained a "defect which relates to motor vehicle safety"

and that the manufacturer was therefore required to notify owners of the potential danger. *See* 15 U.S.C. §§ 1391, 1397, 1402 (1970).[1] General Motors did not comply with the notice order; instead, it filed suit to have the order declared null and void. At the same time the Administrator brought suit to enforce the order and to impose a civil penalty on General Motors for its refusal to comply. The two cases were consolidated and, after substantial discovery, the District Court granted the Government's motion for summary judgment and fined General Motors $400,000— the maximum statutory penalty.[2] This appeal followed. It is our conclusion that the grant of summary judgment was appropriate, but that the penalty should not have been imposed absent briefs or argument on point, or any form of hearing. We therefore remand this case to the District Court for further consideration of the penalty question.

### I

Under the National Traffic and Motor Vehicle Safety Act (Safety Act), manufacturers are required to notify purchasers of motor vehicles containing "a defect which relates to motor vehicle safety," 15 U.S.C. § 1402(e) (1970), as determined by the Administrator of NHTSA. General Motors has conceded, both in the District Court and in this appeal, that the Government successfully established the existence of a "defect" in the Rochester Quadrajet carburetors. When these carburetors were manufactured holes were drilled into them; these holes were later sealed by inserting metal plugs. One of the holes, in the fuel inlet portion of the carburetor, was sealed by a plug known as the "fuel inlet plug." If this plug becomes dislodged gasoline can spill directly into the engine, resulting in a fire under the hood. According to the affidavit of one of General Motors' own employees, a number of these fuel inlet plugs were improperly inserted during the assembly process.[3] While only figures maintained in General Motors' central—as opposed to its regional—offices have been available in this litigation, and while all incidents of carburetor failures clearly may not be reported, the record discloses *at least* 665 reported incidents of engine compartment fires in vehicles equipped with the Rochester Quadrajet carburetor.[4] As General Motors recognized, under prior case law this evidence clearly establishes as a matter of law that the vehicles in question contain a "defect" within the meaning of the Act.[5]

General Motors, however, argues that summary judgment was inappropriate be-

---

1. The Act was amended on October 27, 1974 by Pub.L. No. 93–492, 88 Stat. 1477. The defect notification provision in § 1402 was replaced by 15 U.S.C. §§ 1411–1420, which explicitly require manufacturers to repair or replace defective parts at no charge when the notification order is issued within eight years of the first purchase. However, the definitions of "defect" and "motor vehicle safety," which are central to this litigation, were not altered by the 1974 amendments. Those amendments do not apply to this case, since the order here was issued prior to the effective date of the Act, *see* Pub.L. No. 93–492 § 102(c), 88 Stat. 1477.

2. *United States v. General Motors Corp.*, 417 F.Supp. 933 (D. D.C. 1976). General Motors was unable to obtain a stay of the District Court order pending appeal, and has therefore sent the required defect notifications. *See* Supplemental Memorandum of General Motors Corporation at 2 n.1 (filed Aug. 8, 1977). Our role, of course, is to examine the grant of summary judgment in light of then existing circumstances.

3. *See* Affidavit of Marvin H. Henckel, JA 80.

4. This is the figure offered by General Motors, *see* General Motors br. at 7, and relied upon by its expert in predicting the number of future failures, *see* Affidavit of Alexander I. Pirie, JA 75. The Government asserts that General Motors has received reports of 947 to 1,306 carburetor failures and at least 958 fires in the vehicles in question. *See* Government br. at 29. The Government also claims that there have been "enormously high sales" of replacement fuel inlet plugs, *id.* at 8, and points out that a single manufacturer of these plugs supplied the distribution system with an average of 1,950 replacement plugs per month during a six-month period in 1972. JA 111.

5. *See United States v. General Motors Corp. (Wheels)*, 171 U.S.App.D.C. 27, 518 F.2d 420, 427 (1975).

cause material questions of fact exist as to whether this defect "relates to motor vehicle safety." "Motor vehicle safety" is defined in the Act to mean

> the performance of motor vehicles or motor vehicle equipment in such a manner that the public is protected against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur, and includes nonoperational safety of such vehicles.

15 U.S.C. § 1391(1) (1970). According to General Motors, the defect in the Rochester Quadrajet carburetor does not—or at least may not—pose an "unreasonable risk" of accidents or injuries.

In *United States v. General Motors Corp. (Wheels)*, 171 U.S.App.D.C. 27, 518 F.2d 420, 435 (1975), we held that a "commonsense" approach must be adopted in construing the Safety Act and, particularly, the term "unreasonable." [6] Applying such an approach, we can see no question but that engine fires, which may occur on thoroughfares where pulling over and standing outside the car is difficult or dangerous, or which may take the driver by surprise and quickly spread to the passenger compartment, are extremely dangerous for all involved and should be considered an unreasonable risk to safety. Indeed, this conclusion appears to be mandated by our recent decision in *United States v. General Motors Corp. (Pitman Arm)*, 183 U.S.App.D.C. 30, 561 F.2d 923 (Nos. 75–1751 & 75–1752, decided June 28, 1977), where we held summary judgment to be appropriate where the evidence, as in this case, was uncontradicted as to the critical facts: that failures in the vehicles' steering pitman arms occurred in the past while the vehicles were being driven and that such failures cause the driver to lose control of the car.[7]

In appealing the summary judgment in this case, General Motors seeks to call into question this commonsense conclusion as to what is an unreasonable risk by relying on affidavits of two of its employees presenting predictions as to the likely number of carburetor failures and resulting injuries in the future. The party opposing a motion for summary judgment is, of course, entitled to all favorable inferences in determining whether a genuine issue of material fact has been raised. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *United States v. General Motors Corp. (Wheels)*, *supra*, 518 F.2d at 441. Therefore, we do not consider the credibility of the affidavits or the general trustworthiness of predictions offered by General Motors. Our affirmance of the District Court's summary judgment order rests on the fact that, even if the numbers contained in these affidavits were established to be accurate predictions,

---

6. The definition of "motor vehicle safety" in the Act applies not only to defect notification procedures, but also to promulgation of mandatory motor vehicle safety standards under the Act. According to Senator Magnuson, chairman of the Senate Commerce Committee, "The reason the word 'unreasonable' was put in there is that we hope that there will be some common sense applied to this." Hearings on Traffic Safety Before the Senate Commerce Committee, 89th Cong., 2d Sess. 56 (1966). While safety was considered by the committee to be the "overriding consideration," the committee report noted that in promulgating standards "the Secretary will necessarily consider reasonableness of cost, feasibility and adequate leadtime [*sic*]." S. Rep. No. 1301, 89th Cong., 2d Sess. 6 (1966), U.S.Code Cong. & Admin. News 1966, pp. 2709, 2714.

7. Judge Leventhal, who dissented from this court's holding that summary judgment in favor of the Government should have been granted in *United States v. General Motors Corp. (Pitman Arm)*, 183 U.S.App.D.C. 30, 561 F.2d 923 (Nos. 75–1751 & 75–1752, decided June 28, 1977), took note of the fact that summary judgment had been granted in this case by the District Court. He described this case as one "with some similarities to the present one, albeit one which manifested more dramatic indication of the defect," 561 F.2d at 930 n.33, and, after noting General Motors' prediction of few carburetor failures in the future, concluded that "[t]he facts of the *Quadrajet Carburetor* case [*United States v. General Motors Corp.*, 417 F.Supp. 933 (D. D.C. 1976)] raise the possibility that the manifestation of the defect might be so obviously dangerous that summary judgment *might* be proper." *Id.* (emphasis in original).

this would not relieve General Motors of its obligation to inform the vehicle owners in question of the admitted defect in the cars they are operating.

General Motors' first affidavit seeks to predict the number of injuries likely to be suffered in the future as a result of dislodgment of fuel inlet plugs in 1965 Chevrolets and 1966 Chevrolets and Buicks. Taking into account the number of such vehicles still on the road, and assuming 665 prior fires and between one and 15 prior injuries as a result of these fires, General Motors' manager of Analysis and Product Assurance predicts between less than one and three injuries in the future.[8] The second affidavit is addressed not to the likely number of injuries, but rather to predictions of instances of future plug failure. In this affidavit a General Motors Staff Analysis Engineer concludes that dislodgment of the fuel inlet plugs is due in part to a process of thermal expansion known as "creep" and that, given the age of the cars in question, "*virtually* all creep to which they were theoretically subject has already occurred." Thus it is his view "that the number of future plug failures will be *negligible*."[9]

Apparently General Motors' position is that since, given the passage of time and the reduction in the number of vehicles on the road, many or most of the failures and injuries resulting from this defective carburetor have already occurred, it is no longer required to take any action to protect against those failures that it *admits* will occur in the future. Significantly, General Motors does not even suggest that all "creep" has ceased or that all failures that will occur have already occurred. Rather, it argues only that these failures should somehow be viewed as "negligible"—as capable of being ignored—and that the risk posed by the certain occurrence of at least some engine fires in the future should therefore be considered not "unreasonable." We disagree.

The basic purpose of the Safety Act is to reduce motor vehicle accidents, injuries, and property damage.[10] In adopting the notification provisions of the Act the Senate Commerce Committee found that "[d]eficiencies in past industry practices relating to the notification and curing of manufacturing defects necessitate the imposition of mandatory procedures to insure such notification of purchasers and correction of *all* safety-related defects." S. Rep. No. 1301, 89th Cong., 2d Sess. 4 (1966), U.S.Code Cong. & Admin.News 1966, p. 2712 (emphasis added). In our view, where a defect—a term used in the sense of an "error or mistake"[11]—has been established in a motor vehicle, and where this defect results in hazards as potentially dangerous as a sudden engine fire, and where there is no dispute that at least some such hazards, in this case fires, can definitely be expected to occur in the future, then the defect must be viewed as one "related to motor vehicle safety,"[12] and the Act's basic purpose of protecting the public requires that notification be provided.

---

**8.** Affidavit of Alexander I. Pirie, JA 75. Taking into account the decline in reported fires since 1970, Mr. Pirie further predicted approximately eight future fires and less than one future injury. *Id.,* JA 76.

Similar evidence was offered in *Pitman Arm, supra* note 7. There an expert witness predicted one incapacitating and one nonincapacitating injury in the future as a result of failures in the steering pitman arm. 561 F.2d at 936. As noted earlier, this court ruled that summary judgment in favor of the Government should have been granted.

**9.** Affidavit of Marvin H. Henckel, JA 81 (emphasis added).

In connection with these two affidavits, it should be noted that, since this is a proceeding to secure review and enforcement of the Administrator's 1974 order, the relevant date for purposes of evaluating the appropriateness of a notification order is 1974, not 1976 or 1977. Neither affidavit was prepared, however, until June 1976, which means, of course, that neither was available to the Administrator. In addition, the affidavits do not purport to predict the number of future failures and injuries as of 1974, but rather, according to counsel at oral argument, consider only the post-1976 period.

**10.** S. Rep. No. 1301, *supra* note 6, at 1; Conf. Rep. No. 1919, 89th Cong., 2d Sess. 1 (1966).

**11.** S. Rep. No. 1301, *supra* note 6, at 8.

**12.** *See Pitman Arm, supra* note 7.

In this case it is clear, with the gift of hindsight, that this purpose would have been best served had a notification order been issued some seven years ago. At that time NHTSA, relying substantially on information provided by General Motors predicting a substantial decrease in future carburetor failures, decided not to require notification. General Motors' predictions later proved wholly inaccurate, and the order was finally issued in 1974.[13] Our purpose in noting this is not to assign any fault for this unfortunate delay, or to cast doubt upon the trustworthiness of General Motors' instant predictions on the basis of their past record of inaccuracy. Rather, it is only to point out that if the consumer safety would have been best served by an order in the first instance, it would be most ill served by extending this delay based on new predictions that the number of injuries caused by the defect will diminish.

The fact remains that some of these cars continue to be driven and that, according to General Motors, some "negligible" number of them will burst into flames in the future. Thus General Motors' own affidavits clearly establish that some drivers of 1965 Chevrolets and 1966 Chevrolets and Buicks face not simply an unreasonable risk of carburetor failures—but a virtual certainty. Nor does General Motors dispute that this is a result of improper assembly of the carburetors. To be sure, General Motors does argue, based on instances of injuries reported to it in the past, that the risk of injuries resulting from these "negligible" failures will be "exceedingly small." See General Motors brief at 22. In the context of this case, however, even an "exceedingly small" number of injuries from this admittedly defective and clearly dangerous carburetor appears to us "unreasonably large." Moreover, the fact that in past reported cases good luck and swift reactions have prevented many serious injuries does not mean that

luck will continue to work in favor of passengers of burning cars. As a matter of statistics their chances may well, as General Motors suggests, appear quite favorable. The purpose of the Safety Act, however, is not to protect individuals from the risks associated with defective vehicles only after serious injuries have already occurred; it is to prevent serious injuries stemming from established defects before they occur. To now hold that General Motors, having managed to avoid issuance of an order in 1970, was not required to notify those operators who remain subject to risk since most of the failures have already occurred would be to leave this purpose permanently unfulfilled and to establish a system which encourages manufacturers to delay proceedings whenever possible—at the expense of those endangered by defective vehicles.

This conclusion is in no way undercut, as General Motors suggests, by our view of the " 'commonsense' balancing of safety benefits and economic cost" articulated in *Wheels, supra,* 518 F.2d at 435. In *Wheels* we stated:

> The commonsense limitation reflects an awareness that costs must be considered in determining what safety measures are required by the Act. While some margin of safety must be built-in [*sic*] to protect against failures during day-to-day operation, manufacturers are not required to design vehicles or components that never fail. It would appear economically, if not technologically, infeasible for manufacturers to use tires that do not wear out, lights that never burn out, and brakes that do not need adjusting or relining. Such parts cannot reasonably be termed defective if they fail because of age and wear.

*Id.* at 436. Here we do not deal with a part which is subject to failure because of age and wear, or a part which drivers reasonably expect to have to check and replace

---

**13.** The case was first opened in November 1967 on the basis of a single consumer complaint, and was closed shortly thereafter. It was reactivated in September 1969 after receipt of three additional complaint letters and publication of an article in *Product Engineering* relating to inlet plug failures. *See* JA 93. At that time General Motors predicted a total of 43 carburetor failures in the vehicles in question during 1970 and 1971; it later reported that 167 failures had in fact occurred during this period. *See* JA 103, 134.

because of the particular problem involved. Nor is there involved any question of requiring General Motors to produce perfect, accident-free vehicles at any expense. Rather, we are merely requiring General Motors to notify owners as to a carburetor which did not, from the beginning, meet the manufacturer's own standards for proper assembly and which, absent notification, will in the future cause at least some operators and passengers to be confronted with the clear dangers attending a sudden fire in the engine.

## II

■ Under the Safety Act a manufacturer may be liable for a maximum civil penalty of $400,000 for failure to comply with a notification order issued by the Administrator.[14] While no civil penalty can attach if the manufacturer is successful in defending an enforcement action, a manufacturer who chooses not to comply with an order when issued—and who does not secure a stay of the Administrator's order or an injunction against its enforcement pendente lite —may be penalized if the Administrator's order is upheld.[15] In this case the District Court, after granting the Government's motion for summary judgment, imposed the maximum civil penalty on General Motors for its failure to comply with the Administrator's order.

■ General Motors challenges this penalty on two grounds. First, it argues that the penalty scheme of the Act is unconstitutional. This argument we reject. The penalty provision of the Safety Act serves to encourage manufacturers promptly to obey valid orders of the Administrator, rather than to delay compliance until after judicial review at the potential risk to the public safety.[16] While this legitimate purpose could not constitutionally be furthered by a penalty system which effectively blocked judicial review of reasonable claims, the penalty system of the Safety Act does not operate to do so, and its constitutionality has been recognized in the past.[17] A manufacturer in General Motors' position may secure preliminary injunctive relief against enforcement of the Administrator's order if its claim is a substantial and meritorious one. If such relief is not available to General Motors, as it asserts, because it could not have demonstrated sufficient injury to secure injunctive relief, see General Motors brief at 27, then that alone would seem to establish that, given General Motors' position, a potential penalty of up to $400,000 does not present a very serious obstacle to judicial review. As Justice Cardozo noted in Life & Casualty Ins. Co. v. McCray, 291 U.S. 566, 574–575, 54 S.Ct. 482, 486, 78 L.Ed. 987 (1934):

> One who refuses to pay when the law requires that he shall, acts at his peril, in the sense that he must be held to the acceptance of any lawful consequences attached to the refusal. It is no answer in such circumstances that he has acted in

---

14. The Act provides:

    Whoever violates any provision of section 1397 of this title, or any regulation issued thereunder, shall be subject to a civil penalty of not to exceed $1,000 for each such violation. Such violation of a provision of section 1397 of this title, or regulations issued thereunder, shall constitute a separate violation with respect to each motor vehicle or item of motor vehicle equipment * * *, except that the maximum civil penalty shall not exceed $400,000 for any related series of violations.

    15 U.S.C. § 1398(a) (1970). The maximum civil penalty was increased to $800,000 by the 1974 amendments, see note 1 supra, not applicable here.

15. See Ford Motor Co. v. Coleman, 402 F.Supp. 475, 480 (D. D.C. 1975) (three-judge court),

aff'd, 425 U.S. 927, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976).

16. The 1974 amendments authorize the Administrator to order provisional notification pending the outcome of a civil action. 15 U.S.C. § 1415(b) (Supp. V 1975). No similar provision was previously contained in the Act.

17. See United States v. General Motors Corp., 385 F.Supp. 598, 604 (D. D.C. 1974), order vacated on other grounds, 174 U.S.App.D.C. 70; 527 F.2d 853 (1975); General Motors Corp. v. Volpe, 321 F.Supp. 1112, 1126 n.25 (D. Del. 1970), aff'd as modified, 457 F.2d 922, 923 (3d Cir. 1972). See also Ford Motor Co. v. Coleman, supra note 15, 402 F.Supp. at 488–489 (upholding "substantially similar penalty provisions" of the amended Act).

good faith. "The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Nash v. United States,* 229 U.S. 373, 377, [33 S.Ct. 780, 57 L.Ed. 1232]. * * * It is all "a question of more or less." *Sexton v. Kessler & Co.*[,] 225 U.S. 90, 98 [32 S.Ct. 657, 56 L.Ed. 995]. The price of error may be so heavy as to erect an unfair barrier against the endeavor of an honest litigant to obtain the judgment of a court. In that event, the Constitution intervenes and keeps the court room open. * * * On the other hand, the penalty may be no more than the fair price of the adventure. * * * In that event, the litigant must pay for his experience, like others who have tried and lost.

■ General Motors also argues that the penalty in this case was imposed precipitously, absent argument or briefing on the Government's request for the maximum penalty. The Safety Act provides: "In determining the amount of such penalty * * the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation shall be considered." 15 U.S.C. § 1398(b) (1970). As General Motors concedes, there was certainly no need for any hearing or argument in this case with respect to the "size of the business" criterion. Moreover, as Part I of this opinion makes clear, we see little question as to the gravity of the danger posed

by General Motors' failure to notify owners about the defect in their carburetors. In *Ford Motor Co. v. Coleman,* 402 F.Supp. 475, 489 (D. D.C. 1975) (three-judge court), aff'd, 425 U.S. 927, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976), however, the court, in upholding the similar penalty provisions of the amended Act against constitutional challenge, found that "the reasonableness and good faith of the manufacturer's noncompliance may properly be considered in mitigation of the statutory maximum."

This case was one of the first enforcement actions relating to defect notifications filed in this circuit, *see Wheels, supra,* 518 F.2d at 425 n.1, and at that time there was some uncertainty as to the proper application of the Act. Indeed, as General Motors points out, shortly before this case was filed the Government had been denied summary judgment in the *Pitman Arm* case—a decision recently reversed by this court. *See United States v. General Motors Corp. (Pitman Arm), supra.* As a result there may— although we do not decide—be some basis for imposing *less* than the maximum fine upon General Motors on the ground that its decision to challenge the directive through the courts was a reasonable one.[18] At the very least, we feel, General Motors ought to be heard on this issue. While there is some dispute as to whether it was afforded an opportunity to speak on the penalty question earlier and chose not to—as opposed to whether no opportunity was offered at all [19] —we believe the best course at this time is to remand this case to the District Court for

---

18. On appeal the Government also claims, apparently for the first time, that General Motors should be and has been penalized not only for its refusal to comply with the Administrator's notification order, but also for its failure independently to recall the vehicles in question prior to the NHTSA directive. *See* 15 U.S.C. § 1402(a) (1970). Such a violation, however, is not explicitly mentioned in the proposed findings submitted by the Government to the District Court or in the order actually entered. Moreover, absent some showing of bad faith on the part of General Motors in withholding documents from or submitting false information to NHTSA, there would appear to be little basis for concluding that prior to 1974 General Motors, by relying on the same information accepted by NHTSA as sufficient to justify its failure to order notification, was in violation of

the Act for failing independently to notify owners.

19. In response to the Government's proposed findings of fact and conclusions of law, including its request for the maximum penalty, General Motors asserted: "The penalty question was neither briefed nor argued. General Motors is entitled to further proceedings, including an evidentiary hearing and further discovery of the Government, before the Court makes any determination on that issue." JA 209. The Government responded by claiming that there were no "mitigating factors" in the case, given General Motors' continued refusal to notify. JA 210–212. The penalty was thereafter imposed.

the purpose of considering argument by the parties as to the appropriate penalty.

*So ordered.*